# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 2, 2006

## STATE OF TENNESSEE v. TAVARSKI CHILDRESS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 99-04351, 99-04352     J. C. McLin, Judge**

---

**No.  W2004-02545-CCA-R3-CD  - Filed December 27, 2006**

---

Following a jury trial, Defendant, Tavarski Childress, was convicted of first degree felony murder, reckless homicide, and especially aggravated robbery.  The trial court merged Defendant's conviction of reckless homicide with his felony murder conviction, and Defendant was sentenced to life with the possibility of parole for his felony murder conviction.  Following a sentencing hearing, the trial court sentenced Defendant to twenty-two years for his especially aggravated robbery conviction, and ordered that this sentence be served consecutively to his life sentence.  After filing a petition for post-conviction relief, Defendant was granted a delayed appeal.  In his appeal, Defendant argues as plain error that the admission of his co-defendant's statements to the police during the State's re-direct examination of Sergeant Shemwell violated his constitutional right of confrontation.  Defendant also argues that the trial court erred in imposing consecutive sentencing. After a thorough review of the record, we affirm Defendant's convictions of first degree felony murder and especially aggravated kidnapping.  We affirm the trial court's judgment as to the length of Defendant's sentences, but remand for a new sentencing hearing to reconsider whether consecutive sentencing is appropriate.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgment of the Criminal Court Affirmed in Part; Remanded

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JOHN EVERETT WILLIAMS, joined.

Lance R. Chism, Memphis, Tennessee, (on appeal); and Coleman Garrett and Michelle Betserai, Memphis, Tennessee, (at trial), for the appellant, Tavarski Childress.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; Patience Branham, Assistant District Attorney General; and Gregg Gilluly, Assistant District Attorney General, for the appellee, the State of Tennessee.

# OPINION

Jacqueline Dunlap testified that she had a fight with her husband shortly before midnight on January 12, 1999, and drove to Zeke's Lounge in Memphis where she worked during the day as a waitress. The victim, Richard McRoberts, was alone in the bar. Ms. Dunlap and the victim chatted as Ms. Dunlap swept up behind the bar and the victim stocked the coolers. Ms. Dunlap testified that she heard screaming and looked up to see an African-American man, who was later identified as Vincent Howard, enter the bar through the front door. The man was armed with a rifle, and he screamed, "Give me all your money." The victim told the man to calm down. Ms. Dunlap heard a "thump" at the bar's side door which was locked, and then a second man, whom Ms. Dunlap identified at trial as Defendant, entered the bar through the front door. Ms. Dunlap said that Defendant was wearing a ski mask, but he pulled the mask up after he entered the bar.

The bar stools had been placed on top of the counter earlier that evening. Ms. Dunlap slowly bent down until she was partially hidden by one of the stools. Defendant looked in her direction, and Ms. Dunlap said that Defendant had a pistol in his hand. The victim handed all of the cash in the register to Mr. Howard, but neither Mr. Howard nor Defendant made any move to leave the premises. Ms. Dunlap started screaming. Mr. Howard was pointing the barrel of the rifle over the top of the counter at the victim. The victim lifted the barrel up and started toward Ms. Dunlap. Ms. Dunlap said that she heard two gunshots from the pistol. The victim then fell into her, knocking her to the ground and falling on top of her. Ms. Dunlap heard a gurgling sound coming from the victim's throat. Ms. Dunlap heard a second shot and felt the victim's body jerk. Ms. Dunlap managed to get up and call 911 after the perpetrators left. Ms. Dunlap said that the victim had stopped breathing at this point.

Ms. Dunlap said that the register usually contained approximately $400 in cash when the shifts changed. Ms. Dunlap said that Zeke's Lounge was open twenty-four hours, and the victim was working that night from 11:00 p.m to 6:00 a.m. A derringer was kept on the premises, but Ms. Dunlap did not see the gun that night.

Damien Jamison, Defendant's first cousin, said that he was at Defendant's apartment shortly before the robbery and overheard Defendant say that "he was going to commit a robbery to get back in the dope game." Mr. Jamison could not remember who Defendant was talking to when he made that statement. Mr. Jamison said that he saw a bag of marijuana in Defendant's apartment "a couple of days later."

Officer Shan Allen Tracey with the Memphis Police Department testified that he found a .22 caliber casing on the floor of the bar. The front glass of a cooler had been shattered by a bullet, and a copper bullet jacket consistent with a .38 caliber weapon was discovered in the back of the cooler.

Acting on a tip through Crime Stoppers, Officer Thurman Richardson went to Defendant's apartment on January 14, 1999. Defendant's mother, Catherine Childress, consented to a search of

her apartment which revealed the presence of crack cocaine and marijuana. Defendant, accompanied by Ms. Childress, was transported to the Memphis Police Department for questioning. Sergeant Anthony F. Craig testified that he read Defendant his *Miranda* rights prior to the interview, and Defendant executed a written waiver of his rights. Ms. Childress was present during the interview and signed the waiver form as a witness.

In his first statement, Defendant said that he was present at Zeke's Lounge when the victim was killed. Defendant said that a friend named "Ty" came over to his apartment after school and asked Defendant "to put his gun up for him." Defendant did not know Ty's given name. Defendant told Ty that his mother would get angry if she saw the gun, so Defendant hid the gun outside in some bushes. Ty left but returned to Defendant's apartment later that evening around 10:30 p.m. Ty told Defendant to go get the gun, and Defendant put the gun in his pocket. Defendant said he thought the gun was a .38 or .357 caliber revolver. Defendant and Ty left the apartment, and Defendant said he thought that they were walking to Ty's house. Instead, Ty led him through some woods and an open field that eventually led to Zeke's Lounge. Ty said, "Let's go in the bar."

Defendant said that they went inside the bar, and a man told them to leave. Defendant said he was "ready to leave," but Ty pulled his ski mask down over his face and told the man to give him the money from the cash register. The man gave Ty the money, but Ty continued to hold his gun on the man. Defendant said that the man "tried to snatch the gun and run," and "that's when Ty started shooting." Defendant said that Ty fired his weapon two or three times, and then the two men ran away from the bar through the woods.

Defendant said that he had his gun out during the robbery, but he denied that he pointed the gun at anyone and maintained that he did not fire his weapon. Defendant said that Ty was carrying a long rifle with a wooden handle. Defendant said that Ty hid the rifle near the Idlewood Apartments by a tree near a fence. Defendant said that Ty was a member of the Gangsters Disciples, but he denied that he was a member. Defendant said that Ty told him that if he told anyone about the robbery and killing that he would cut Defendant's throat or shoot him.

Sergeant Craig said that at the conclusion of the interview, he told Defendant to let him know if he had anything to add to his statement. Sergeant Craig left Defendant and Ms. Childress alone in the interview room. Some time later, Ms. Childress told Sergeant Craig that Defendant wanted to talk to him. Sergeant Craig read Defendant his *Miranda* rights again, and Defendant signed a written waiver form which Ms. Childress signed as a witness.

In his second statement, Defendant said that Ty came over to his apartment on the evening of January 12, 1999, and Ms. Childress sent him and Ty to the store. When they returned, Ms. Childress saw Ty with a .22 caliber rifle and told him to leave. The young men left Defendant's apartment, and Defendant carried Ty's .38 revolver with him. Defendant said they cut through the woods until they reached Zeke's Lounge. Ty told Defendant to wait while he "check[ed] something out." Ty returned and told Defendant that only a man and a woman were in the bar, and "he was

fixin [sic] to rob them." Defendant said that Ty gave him a black skull cap. Defendant described the ensuing events as follows:

> So Ty told me he was fixin[g] to go through the front door and he wanted me to go through the side door[,] but when I went to the side door it was locked. Now Ty had already went through the front door wit[h] his rifle pointed at the man askin[g] for money. So I couldn't get in the side door so I had to come in the door he went through.

> When I came in, I already had the gun out. Ty had his gun in the man's face[,] and the man raised his hands and said he didn't have nuthin [sic]. So Ty cocked the gun and that's when the lady said that he don't have nuthin [sic] and Ty said, "shut up b___." That's when I told the lady, "y'all give him the money" because I already knew he [Ty] was kind'a [sic] crazy.

> The man went in the cash register and got the money. He had bills one through twenty. All of them were in separate stacks with paper clips. Ty got the money. The man tried to hit Ty's gun and run to the back so Ty opened fire and shot the man[,] and I had shot the mirror and the wall[,] and me and Ty ran out of the club.

Defendant said that Ty hid the rifle and ski mask in a wooded area by Idlewood Apartments. Defendant said he did not know what happened to the other gun. Defendant said Ty told him to "put his gun" on the woman in the bar when he got inside the bar.

Sergeant Craig said that he and other officers searched the woods near Idlewood Apartments later that night. He said that they did not discover any weapons, but found a jacket and black ski cap. On cross-examination, Sergeant Craig said that Ms. Childress did not appear sleepy during the interview.

Defendant was released after the second interview. Officer Richardson returned to Defendant's apartment for a second search on January 17, 1999. Officer Richardson asked Defendant for the location of the weapons used during the robbery. Defendant said the .22 caliber rifle was in a dumpster on the apartment's premises. Defendant said that he gave the .38 caliber revolver to "one of his associates" and told the officers where it was located. Officer Richardson said that the rifle was later recovered from the dumpster described by Defendant, and the revolver was found in a dog house behind a house on Eldridge Avenue. Officer D. H. Rowe testified that the revolver had one spent round of ammunition, and the rifle had one live shot in the chamber.

Steve Scott, a special agent with the T.B.I. crime lab was qualified as an expert in the area of firearms identification. Agent Scott testified that the copper jacket and the bullet found at the crime scene were fired from the .38 caliber revolver found on Eldridge Avenue. Agent Scott said

that he was unable to conclusively match the .22 caliber bullet retrieved from the victim's body with the .22 caliber rifle found in the dumpster.

Dr. O'Brien Cleary Smith, the medical examiner for Shelby County, testified that the victim died as a result of a gunshot wound to the chest. In addition to the gunshot wound, the victim had fresh bruises and abrasions on both knees consistent with hitting the floor with his knees. Dr. Smith said that the victim's internal bleeding would have caused a gurgling sound to be emitted from his windpipe.

Sergeant Robert Shemwell with the Memphis Police Department testified that the investigating officers were unable to lift any identifiable fingerprints from the crime scene. During a lengthy cross-examination, Sergeant Shemwell stated that the attention was focused on Defendant and Mr. Howard early in the investigation as a result of a tip from Crime Stoppers. Mr. Howard was arrested at Frayser High School, but Defendant was not at school that day. Sergeant Shemwell said that Mr. Howard was eighteen years old. In response to defense counsel's questions, Sergeant Shemwell said that Nick Greer, the coordinator of the Gangster Disciple Gang at North Watkins Manor Apartments, confirmed that both Defendant and Mr. Howard were members of the gang and that was how Defendant "came in possession of the handgun." Sergeant Shemwell acknowledged that Vincent Howard admitted shooting the .22 caliber rifle at Zeke's Lounge. He also acknowledged that Ms. Childress told the investigating officers that she knew about the robbery the night it occurred. Sergeant Shemwell confirmed that his report dated January 16, 1999, reflected that Mr. Howard "advised that the information that [Defendant] gave [to investigating officers] was quite the truth and [Defendant] knew more about the whereabouts of the weapons used." Sergeant Shemwell said that Ms. Childress instructed Mr. Howard and Defendant not to tell anybody about the robbery.

During his cross-examination, Sergeant Shemwell stated that Nick Greer told the investigating officers that he had given Defendant a .38 revolver prior to the robbery. After the offenses, Mr. Greer told the officers that the .38 revolver he had given to Defendant was in a doghouse behind his mother's home on Eldridge Avenue.

On redirect examination, Sergeant Shemwell said that Mr. Howard told investigating officers that it was Defendant's idea to commit a robbery, and that the two of them looked for a place to rob, eventually ending up at Zeke's Lounge. Sergeant Shemwell confirmed that Mr. Howard told the investigating officers that he and Defendant returned to Defendant's apartment after the robbery, divided the proceeds, and purchased some marijuana and cigars. Mr. Howard stated that he and Defendant played cards, shot dice, and smoked marijuana after the commission of the offense.

The State rested its case-in-chief, and Defendant presented his defense. Ms. Childress testified that Defendant was fifteen years old, and in the seventh grade. Ms. Childress could not articulate a reason why Defendant had not progressed further in school other than it "had a lot to do with his father's death" when Defendant was approximately six years old. Ms. Childress denied that she took drugs in front of her children. Ms. Childress said that she sent Defendant to the store

around 7:00 p.m. on January 12, 1999, to buy bread and ice cream. Defendant returned around 11:00 p.m. without any purchases and accompanied by Mr. Howard. Defendant told Ms. Childress that Mr. Howard had shot someone, and that Mr. Howard thought he had killed the person. Ms. Childress said she did not ask Defendant any more questions because she did not believe he was involved in whatever Mr. Howard had done. Ms. Childress made Mr. Howard leave the apartment because he had a gun, and Defendant stayed home.

Ms. Childress acknowledged that she accompanied Defendant to the police station for questioning, but she said she slept through the entire interview. Ms. Childress said that the only thing she remembered was that she woke up and found Defendant crying because "people [were] making him say something or do something that he know[s] he did not do or something like that." Ms. Childress denied making a written statement to the investigating officers.

## II. Admission of Co-Defendant's Out-of-Court Statements

Relying on *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), Defendant argues that Sergeant Shemwell's testimony on redirect examination detailing those portions of Mr. Howard's out-of-court statements which implicated Defendant in the commission of the offenses violated his Sixth Amendment right of confrontation. Defendant acknowledges that defense counsel did not contemporaneously object to the challenged testimony, or raise the issue in Defendant's motion for new trial. Defendant urges review of this issue as "plain error." *See* Tenn. R. Crim. P. 52(b).

The State contends that Defendant has waived consideration of this issue on appeal. "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e); *see State v. Martin*, 940 S.W.2d 567, 569 (Tenn.1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial); *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App.1989). In addition, appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a).

Whether properly assigned or not, however, this Court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. *State v. Ogle*, 666 S.W.2d 58, 60 (Tenn. 1984). Issues predicated on a *Bruton* violation may be noticed as plain error. *Id*. "Plain error," however, is not merely error that is conspicuous, but is an especially egregious error that strikes at the fairness, integrity, or public reputation of the judicial proceedings. *See State v. Wooden*, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this Court established five factors to be applied in determining whether there is plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused [must not have waived] the issue for tactical reasons; and

(e) consideration of the error must be "necessary to do substantial justice."

*Id*. (citing Tenn. R. Crim. P. 52(b)). The record must support the presence of all five factors; the absence of only one factor precludes further consideration. *State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000).

The *Bruton* Court held that the admission of a co-defendant's confession in a joint trial implicating the defendant violates the defendant's constitutional right of confrontation. *Bruton*, 391 U.S. at 137, 88 S. Ct. at 1628. The court observed that the "'right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him' secured by the Sixth Amendment." *Id*. at 126, 88 S. Ct. at 1623 (quoting *Pointer v. State of Texas*, 380 U.S. 400, 404, 85 S. Ct. 1065, 1068, 13 L. Ed. 2d 923 (1965)). Later, the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L. Ed. 2d 177 (2004) reiterated that the Confrontation Clause bars the admission of "testimonial" statements by an unavailable witness unless the defendant has had a prior opportunity to cross-examine the witness. "Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard." *Id*. at 52, 124 S. Ct. at 1364.

The State argues, however, that Defendant's issue is controlled by *Tennessee v. Street*, 471 U.S. 409, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985) rather than *Bruton*. The State submits that the statements which Defendant now challenges were elicited during the State's redirect examination of Sergeant Shemwell in response to the questions posed during defense counsel's cross-examination. The State contends that Mr. Howard's statements presented on redirect examination were not offered for the truth of the matters asserted in the statements, but to rebut Defendant's argument that he was less culpable that Mr. Howard.

In *Street*, the defendant testified at trial that he did not commit the charged offenses and that his confession was coerced. The defendant maintained that the investigating officer read him his co-defendant's statement concerning the offenses and directed defendant to say the same thing in his own statement. In rebuttal, the State called the investigating officer to testify about the defendant's interview. To rebut the defendant's claim that "his own confession was a coerced imitation," the witness read the non-testifying co-defendant's statement to the jury. *Id*. at 411-412, 105 S. Ct. at 2080. The trial court instructed the jury that the co-defendant's statement was not admitted for the truth of the matters stated therein, but "for the purpose of rebuttal only." *Id*. Under the facts and circumstances presented in that case, the Supreme Court concluded that "[t]he *nonhearsay* aspect

of [the co-defendant's] confession – not to prove what happened at the murder scene but to prove what happened when respondent confessed – raises no Confrontation Clause concerns." *Id*. at 414, 105 S. Ct. at 2081-82; *see also State v. Zirkle*, 910 S.W.2d 874, 891 (Tenn. Crim. App. 1995) (finding no *Bruton* violation when the State offered another statement by the co-defendant which was inconsistent with the statement placed into evidence by the defendant, and the trial court instructed the jury that the statement could be considered for impeachment purposes only).

In the case *sub judice*, however, Defendant strenuously contends that the State did not elicit Mr. Howard's out-of-court statements on redirect examination for impeachment purposes only, but offered the statements as substantive proof that Defendant was the mastermind behind the robbery and that he shared in the proceeds. We note that in the absence of a timely objection as to admissibility, the evidence becomes admissible "notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence 'for its natural probative effects as if it were in law admissible.'" *Smith*, 24 S.W.3d at 280 (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)); *see also* Tenn. R. Evid. 105 ("When evidence which is admissible for one purpose but not admissible . . . for another purpose is admitted, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly") (emphasis added).

Nonetheless, based on the facts and circumstances presented in the instant case, Defendant's evidentiary challenge is controlled by our supreme court's decision in *State v. Robinson,* 146 S.W.3d 469 (Tenn. 2004).

In *Robinson*, defense counsel elicited testimony from a police officer concerning a photographic lineup which the officer had prepared during his investigation. The officer acknowledged that two individuals had identified the defendant based on the line-up, one of whom was Shaun Washington. On re-direct, the State inquired as to Mr. Washington's demeanor during the viewing, and the officer replied, "'He was very sure of himself." The defendant did not object to the testimony. *Id*. at 492-93.

Relying on *Crawford v. Washington*, the defendant argued on appeal that the police officer's testimony about Mr. Washington's identification of him constituted inadmissible hearsay that violated his constitutional right of confrontation. Our Supreme Court concluded in *Robinson*:

> While the defendant may very well be correct that both *Crawford* and Tennessee Rule of Evidence Rule 803(1.1) bar hearsay statements of identification if the declarant does not testify at trial, neither *Crawford* nor Rule 803(1.1) is dispositive in this case because the defendant himself both elicited and opened the door to the testimony he now assigns as error. Under these circumstances, the defendant is not entitled to relief. Indeed, it is well-settled that a litigant will not be permitted to take advantage of errors which he himself committed or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect of misconduct.

*Id*. at 493 (citations omitted).

During Sergeant Shemwell's cross-examination, defense counsel posed the following questions:

[Q]:     But you did take Vincent Howard downtown.

[A]:     That's correct.

[Q]:     And he initially denied any involvement in this crime, didn't he?

[A]:     Vincent Howard initially did.  That's correct.

. . .

[Q]:     Did Vincent Howard, subsequently to denying his involvement in this incident, admit that he was the one that shot Mr. McRoberts?

[A]:     He admitted to shooting a rifle.  That's correct.

[Q]:     Did he tell you what [Defendant] had told [you] in his statement was correct, that he was the one that shot Mr. McRoberts?

[A]:     He didn't know what [Defendant] had told us so, therefore, he wouldn't have that information to give us.

. . .

[Q]:     Tell this jury about this incident where an officer was sent out to photograph some writing on the blackboard.

[A]:     That was during an interview with Vincent Howard prior to us taking him downstairs.  He wrote on the blackboard some information.  Just some scribbling.  I don't really recall exactly what it was.  It was basically about him not caring about anything and no one cared about him and everybody could die in Frayser [High School].

[Q]:     Let me ask you if this sounds familiar.  "T-Y, I'm going to kill everybody why I is dead in the world, plus everyone in here.  Frayser everybody going to die.  T-Y till he die.  I won't die anyway.  Just die, die, die, die.  T-Y not for sale for nobody.  T-Y don't care."

[A]:     That's correct.

. . .

[Q]:    Do you remember your report, an entry that was made on January 16th; you were advised by Sergeant[s] Ashton and Rile that the suspect, Vincent Howard, has confessed to shooting the victim during a robbery at Zeke's.

[A]:    Yes, sir.

[Q]:    It's stated further that Howard advised that the information that [Defendant] gave was quite the truth and knew more about the whereabouts of the weapons used. Did Vincent Howard tell you that [Defendant's] mother – I'm sorry. Strike that.

. . .

[Q]:    Is it your information that [Defendant's] mother knew about this incident and knew what had happened and instructed other individuals not to tell anyone.

[A]:    That statement came right after those two ran in after the robbery/killing itself. When [Mr. Howard and Defendant] came into the apartment, they knew then that they had committed it. And that was when [Ms. Childress] made the statement not to tell anybody, not to tell the police.

The prosecutor then posed the following questions on redirect examination:

[Q]:    [Defense counsel] asked you about information you received from Vincent Howard.

[A]:    Yes, ma'am.

[Q]:    As a matter of fact would you say you got a little or a lot of information from Vincent Howard?

[A]:    I would say we got a lot of information from him.

[Q]:    He gave an eight-page statement; is that right?

[A]:    That's correct.

. . .

[Q]:    And didn't [Mr. Howard] say that [Defendant] asked him if he could get a pistol to go rob him?

[A]:    That's correct.

[Q]:    And then didn't he explain how they went looking for places to rob?

[A]:    Yes.

[Q]:    And then they ended up at Zeke's.

[A]:    That's correct.  They had also made arrangements with some of their friends in locating ski masks in order to do this as well.

[Q]:    And who was sort of the thought proces[s] behind all of this?

[A]:    According to Vincent Howard it was [Defendant].

[Q]:    And then where did they go after they did this robbery and killing at Zeke's?

[A]:    They went to [Defendant's] apartment.

[Q]:    Went to [Defendant's] apartment where his mother was.

[A]:    That's correct.

[Q]:    And then what did Vincent Howard tell you that they did at [Defendant's] apartment . . . right after this robbing?

[A]:    They went in and they split the money up, and I believe he left and went to a friend's apartment, if I'm not mistaken.  Well, I take that back.  They purchased some marijuana with some of it.  And they sent Toni, the female crack user, she went out and bought them some cigars and some marijuana. And they came back and they smoked some dope, and then I think he left later.

On recross-examination, defense counsel asked Sergeant Shemwell:

[Q]:    Now, Vincent Howard told you or your office that [Defendant] was the mastermind behind this whole situation?

[A]:    That's correct.

[Q]:    The same Vincent Howard who initially told you that he didn't have anything to do with it.

[A]:    That's correct.

-11-

[Q]:    The same Vincent Howard that is the 18-year-old and [Defendant] the fifteen-year-old.

[A]:    He's 18 in age, that's correct.

[Q]:    The same Vincent Howard that told you that he shot Mr. McRoberts?

[A]:    That's correct.

On further redirect examination, the prosecutor asked Sergeant Shemwell what he meant by the phrase, "18 in age." Sergeant Shemwell stated that Mr. Howard's mother described her son as "slow," and in talking with him, the officers believed that Mr. Howard did not have the "mentality of a normal 18-year-old."

Faced with Defendant's statement to the police officers acknowledging his presence during the offenses, and Ms. Dunlap's identification testimony, Defendant's theory of defense at trial was that Defendant, as the younger of the two men, merely followed Mr. Howard without intending to participate in the robbery and thus lacked the requisite intent to support a finding that he was criminally responsible for Mr. Howard's actions. Defendant contended that his actions resulted from the lack of any meaningful parental guidance and the coercive influence of the Gangster Disciples as represented by Mr. Greer. In support of this theory, out-of-court statements, tending to exculpate Defendant as a primary actor in the offense, and made by Mr. Howard to the investigating officers, were presented to the jury.

Mr. Howard, however, also apparently made a number of statements to the investigating officers which were inconsistent with the statements elicited on cross-examination and which tended to depict Defendant's role in the offenses as more than a passive participant. In *State v. Land*, 34 S.W.3d 516, 530-533 (Tenn. Crim. App. 2000), this Court explained the "doctrine of curative admissibility" which may arise in situations such as those presented in the case *sub judice*.

In *Land*, the State, on direct examination, attempted to elicit testimony concerning a non-testifying witness's statements from the police officer to whom the statements were made. The defendant timely objected to the statements, and the trial court sustained the defendant's objection, finding that the statements constituted inadmissible hearsay. During cross-examination, however, defense counsel repeatedly questioned the police officer as to the State's proof of intent to support the charged offense. Because the State's proof was based on the statements received from the non-testifying witness which, as a result of the trial court's earlier ruling, were inadmissible, "the inference was raised that the State had no proof of a theft and had wrongfully charged the [defendant] of the crime." *Land*, 34 S.W.3d at 530. By inquiring into proof of intent to support the theft charge, the trial court found that "the defense had 'opened the door' and permitted the State to introduce the hearsay statements of the defendant's mother, Mrs. Land, which it had previously held inadmissible." *Id*.

This Court stated:

> Clearly, the statements of Mrs. Land during the telephone conversation with Detective Brown constitute hearsay and do not fall within a recognized hearsay exception. *See* Tenn. R. Evid. 801. Notwithstanding, we conclude that the statements were properly admitted during redirect examination under the doctrine of curative admissibility. Most often employed in criminal cases where the "door" to a particular subject is opened by defense counsel on cross-examination, the doctrine of curative admissibility permits the State, on redirect, to question the witness to clarify or explain the matters brought out during, or to remove or correct unfavorable inferences left by, the previous cross-examination."

*Id.*

The *Land* court further observed that "[s]pecifically, in a criminal case, '[t]he rule operates to prevent an accused from successfully gaining exclusion of inadmissible prosecution evidence and then extracting selected pieces of this evidence for his own advantage, without the Government being able to place them in their proper context.'" *Id.* at 531 (quoting *Lampkins v. United States*, 515 A.2d 428, 431 (D.C. 1986)). The scope of the State's redirect examination, however, is limited to "[o]nly that evidence which is necessary to dispel the unfair prejudice resulting from the cross-examination." *Id.* at 531-532.

Mr. Howard gave inconsistent statements to the investigating officers as to the degree of Defendant's involvement in the offenses. By selecting only those statements which tended to diminish Defendant's role, the jury was left with an unfavorable inference of the type contemplated in *Land*. Although Defendant contends that the scope of the State's redirect examination exceeded the limitations contemplated by *Land*, based on our review, we conclude that the introduction of Mr. Howard's out-of-court statements during the State's redirect examination of Sergeant Shemwell was not error.

Accordingly, because we find no error, Defendant has failed to establish that a substantial right has been adversely affected by the admission of this testimony. This precludes the presence of "plain error." *Adkisson*, 899 S.W.2d at 639. Defendant is not entitled to relief on this issue.

## III. Imposition of Consecutive Sentencing

Following a sentencing hearing, the trial court sentenced Defendant to twenty-two years as a Range I, standard offender, for his especially aggravated robbery conviction, a Class A felony. Defendant does not challenge the length of his sentence. Defendant contends, however, that the trial court erred in imposing consecutive sentencing because the trial court failed to make the requisite *Wilkerson* findings to support Defendant's classification as a dangerous offender. *See* T.C.A. § 40-35-115(b)(4); *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

When a defendant challenges the length or the manner of service of his or her sentence, this Court must conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002). This presumption, however, is contingent upon an affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). If the record fails to show such consideration, the review of the sentence is purely *de novo*. *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determinations the trial court must consider: (1) the evidence presented at the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct; (5) any appropriate enhancement and mitigating factors; (6) the defendant's potential or lack of potential for rehabilitation or treatment; and (7) any statements made by Defendant in his own behalf. T.C.A. §§ 40-35-103 and -210; *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995). The defendant bears the burden of showing that his sentence is improper. T.C.A. § 40-35-401(d) Sentencing Commission Comments; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

When a Defendant is convicted of multiple crimes, the trial court, in its discretion, may order the sentences to run consecutively if it finds by a preponderance of the evidence that a defendant falls into one of seven categories listed in Tennessee Code Annotated section 40-35-115. In this instance, the trial court found that Defendant was "a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." T.C.A.§ 40-35-115(a)(4). If the trial court rests its determination of consecutive sentencing on this category, the court must make two additional findings. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, the trial court must find that an extended sentence is necessary to protect the public from further criminal conduct by Defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *Wilkerson*, 905 S.W.2d at 939. Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentences is also guided by the general sentencing principles that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed.'" *Imfeld*, 70 S.W.3d at708 (quoting T. C. A. §§ 40-35-102(1) and -103(2)); *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court based its imposition of consecutive sentencing on its finding that Defendant was a dangerous offender. *See* T.C.A. § 40-35-115(b)(4). The trial court stated,

> But I did find that he's a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Now, I did find that because he went in and robbed this place with the co-defendant. Shots were fired by him. And I find that he is a dangerous offender.

-14-

Here, the trial court's findings essentially tracked the statutory language relevant to the dangerous offender classification without making the requisite findings under *Wilkerson* to support consecutive sentencing on the grounds that Defendant is a dangerous offender. Specifically, the trial court failed to make any findings concerning the need to protect society from Defendant and the relationship of the length of the term to the severity of the offenses. Because such findings are critical to our review, we reverse the trial court's judgment as to consecutive sentencing, and remand to the trial court for a new sentencing hearing to reconsider whether consecutive sentencing is appropriate. The length of the sentences is affirmed.

## CONCLUSION

After a thorough review, we affirm Defendant's convictions of first degree felony murder and especially aggravated robbery, and the length of the sentences. We reverse the trial court's judgment as to consecutive sentencing and remand to the trial court for a new hearing solely on the issue of whether the sentences are to be served concurrently or consecutively.

 

 

_____
THOMAS T. WOODALL, JUDGE